```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,     )
                                   )
 4              Plaintiff,         )
                                   )   Case No. 2:17-cr-20274-1
 5         -vs-                    )
                                   )
 6   D-1 JUMANA NAGARWALA,         )
     D-2 FAKHRUDDIN ATTAR,         )
 7   D-3 FARIDA ATTAR,             )
     D-4 TAHERA SHAFIQ,            )
 8   D-5 FARIDA ARIF,              )
     D-6 FATEMA DAHODWALA,         )
 9                                 )
                Defendants.        )
10   _____

11              MOTION FOR PRETRIAL RELEASE and
        DEFENDANT'S MOTION TO AMEND/CORRECT BOND CONDITIONS
12          BEFORE THE HONORABLE BERNARD A. FRIEDMAN
                UNITED STATES DISTRICT JUDGE
13        Detroit, Michigan - Tuesday, September 19, 2017

14   APPEARANCES:

15   FOR THE GOVERNMENT:    SARA D. WOODWARD, ESQ.,
                            MALISA CHOKSHI DUBAL, ESQ.,
16                          JOHN K. NEAL, ESQ. and
                            AMY MARKOPOULOS, ESQ.
17                          United States Attorney's Office
                            211 W. Fort, Suite 2001
18                          Detroit, Michigan 48226
                            (313) 226-9180
19

20   FOR THE DEFENDANT :    SHANNON M. SMITH, ESQ.
     Jumana Nagarwala       Law Offices of Shannon M. Smith, P.C.
21                          1668 South Telegraph Road
                            Suite 140
22                          Bloomfield Hills, Michigan 48302
                            (248) 636-259
23

24   FOR THE DEFENDANT :    MARY CHARTIER-MITTENDORF, ESQ.
     Fakhruddin Attar       1905 Abbot Road, Suite 1
25                          East Lansing, Michigan 48823
                            (517) 885-3305
```

```
 1  APPEARANCES (Continued):

 2  FOR THE DEFENDANT  :   MATTHEW R. NEWBURG, ESQ.
    Farida Attar              Newburg Law, PLLC
 3                           4112 W. St. Joe Highway,
                             Suite C
 4                           Lansing, Michigan 48917
                             (517) 505-2323
 5

 6  FOR THE DEFENDANT  :   JEROME SABBOTA, ESQ.
    Tahera Shafiq            Ribitwer & Sabbota
 7                           26862 Woodward Avenue
                             Suite 200
 8                           Royal Oak, Michigan 48067
                             (248) 543-8000
 9

10  FOR THE DEFENDANT :    ANJALI PRASAD, ESQ.
    Farida Arif              Prasad Legal, PLLC
11                           117 West 4th Street, Suite 201
                             Royal Oak, Michigan 48067
12                           (248) 733-5006

13  FOR THE DEFENDANT :    BRIAN M. LEGGHIO, ESQ.
    Fatema Dahodwala        Legghio Garrison, PLLC
14                           134 Market Street
                             Mt. Clemens, Michigan 48043
15                           (586) 493-7000

16

17

18

19  REPORTED BY:           Darlene K. May, RMR, CRR, CSR
                             231 W. Lafayette Boulevard
20                           Detroit, Michigan 48226
                             (313) 234-2605
21

22  (Proceedings reported by mechanical stenography.  Transcript
     produced on a CAT system.)
23

24

25
```

TABLE OF CONTENTS

PROCEEDINGS:                                                      PAGE:

  Motion to Amend Bond                                            5

  Motion for Pretrial Release                                    10

  Court Reporter's Certificate                                   38


EXHIBITS:

     (None offered)

1    Tuesday, September 19, 2017

2    11:03 a.m.

3    -- --- --

4    CASE MANAGER MULLINS:  The next is the case of the

5    United States of America versus Fakhruddin Attar and Farida

6    Attar.  It's a motion to modify the bond.

7    THE COURT:  Again, there's the same appearances.

8    Let the record reflect that there was a motion which

9    was granted to modify bond and the government's response was,

10   essentially, that they agreed to much of what was being

11   requested.  What is left?

12   I think a library is one of the issues that was

13   objected to by the government.  Other than the library, has all

14   the other matters been resolved?

15   MS. WOODWARD:  Your Honor, the motion raises six

16   issues.  We agreed to four of them and that stipulation has

17   been entered.  That leaves us with two issues identified in

18   Defendant Attar's motion.  Those are, first, the request that

19   the Court order that the Attars can reside at home with their

20   minor child, and the government does oppose that request for

21   the reasons set forth in our sealed response.

22   And then second, you're correct, Your Honor, that they

23   be allowed to go to a library to assist in their defense.  And

24   we also oppose this request because we don't know where they

25   will be going or who they might be meeting with.  Libraries are

1  public and have internet access and that would violate two of

2  the other important bond conditions that they both have.

3          THE COURT:  Response?

4          MS. CHARTIER:  Yes, Your Honor.

5          THE COURT:  Hold on a second.

6          Okay.  Go.

7          MS. CHARTIER:  Thank you.  This Court had already held

8  that the Attars could live at home when they were originally

9  released.  This Court repeatedly indicated that its wish is

10 that the Attars be at home in terms of pretrial monitoring.

11 The issue at the time was the state court order that prohibited

12 the Attars from being in the home with their daughter.

13         We then filed a motion seeking an amended order

14 because the state court wanted a more specific order that the

15 Attars could live at home.  This Court issued that order.  And

16 then the state court's concern was that there was still 7H,

17 which was the bond continue that the Attars not have any

18 contact with a potential witness or victim in this case.

19         In this situation there are numerous family members

20 who the Court stated that the Attars could have communication

21 with and had indicated in one of the prior transcripts that, in

22 communication with their daughter, they just couldn't talk

23 about the case.  And when the government expressed that it

24 would be hard to monitor that, the Court stated that that would

25 come out one way or the other.

1            So the only issue here is an amendment to prior orders

2    of the Court and that's just, specifically, indicating that the

3    Court amends bond condition 7H so that the Attars can live with

4    their daughter.

5            I point out that other defendants are being allowed to

6    live with their minor children.  I'd also point out that the

7    minor in this case was interviewed by CPS and the FBI weeks

8    before the Attars were ever arrested.  The Attars did

9    absolutely nothing to try to influence any potential testimony

10   that she would offer.  They had visits with her.  They speak

11   with her on the telephone.  There's been absolutely nothing to

12   indicate that they are violating this Court's order in terms of

13   talking to someone who may be a potential witness.

14           So we would ask the Court to allow the Attars to live

15   in their house by amending the order, recognizing that we still

16   then need to go to the state court and ask the judge to allow

17   that as well.  But the judge's big condition -- or big concern

18   was bond condition 7H.

19           The other issue as it relates to the library is that

20   the Attars don't have any sort of internet access at this point

21   in time, which does it make it difficult for them to assist in

22   their defense by providing information on medical treatises

23   that we should be taking a look at or anything in that regard.

24   When they were in custody, they actually did have access to a

25   law library and they could provide some information.  We're

```
1   only asking that they be allowed to assist in their defense

2   with, of course, the approval from pretrial services as to when

3   they would be able to go and when they would be able to go

4   back.

5           THE COURT:  All right.

6           MS. WOODWARD:  I don't have much more to add to the

7   first issue.  I don't dispute Ms. Chartier's characterizations

8   of our prior court hearings on that issue.

9           THE COURT:  We all agree that the state court still

10  has an order that says that they cannot be with their children?

11          MS. CHARTIER:  They can't be living in the same home.

12  They're able to have visits and speak on the telephone.  The

13  Court's concern when we went back with what we thought was a

14  more specific order, was the Court said there's still a bond

15  condition 7H that indicates that they cannot speak with a

16  potential witness.  And then when we said, well, again, the

17  Court was aware of that, the state court said, essentially, we

18  still have the 7H bond condition and she wanted to make sure

19  that any order that she may issue was not in violation of the

20  federal bond conditions.

21          That doesn't mean that the judge is going to grant the

22  order in the state court proceeding.  We're just looking to

23  pave the way for her to be able to do it.

24          THE COURT:  My position is -- because the state case

25  is a totally different case.  It has to do with matters that I,
```

1    number one, have no jurisdiction over; and number two, really

2    no feel for.  No expertise.  I mean, that has to do with the

3    welfare of the children thing -- matters that I have no

4    information on and no knowledge.  And I don't even pretend to

5    want to order anybody to do something when it comes to the

6    welfare of children because I have no idea.

7         So I can't allow them to live in the house at this

8    point because I believe there is an order of the court that at

9    least has more insight in terms of their issue than I do.  And,

10   of course, I will leave it open.  You know how to file a

11   motion, but I don't think that this Court should interfere with

12   issues and relations to the children and their welfare.

13        As to the second issue, the library, the Court

14   believes that that's too hard to police.  The pretrial

15   services, how would they do it?  And the library is a too open

16   and public place.  And I'm not suggesting that your clients are

17   going to do anything against the order, but it's just too hard

18   to be able to -- it's too big of a public place, too much

19   exposure to even be able to put the burden on pretrial services

20   to be able to do their job.  Therefore, the Court will deny

21   both of those.

22        However, in the terms of the living arrangements,

23   we'll see what happens in the state.

24        MS. WOODWARD:  I believe what she's saying is that the

25   state court can't even make that determination because they

1  believe that our court has prohibited the Attars from living

2  with their child.

3          THE COURT:  I'll modify that and say prohibited

4  because of the order of the Oakland County Court.  Then, I

5  mean, that will tell the Oakland County Court, the only reason

6  I'm saying it is because they're saying it.

7          MS. WOODWARD:  I guess we could add language that says

8  should the Oakland Court --

9          THE COURT:  Sure.  Should the Oakland County Court

10  allow it, this Court would -- this Court would allow it.  I

11  would allow it.  I mean, if the children are in jeopardy and

12  pretrial services can monitor it, I've always said that.

13          MS. WOODWARD:  Thank you.

14          MS. CHARTIER:  And Ms. Woodward has articulated our

15  position.  Could we draft an order indicating that this Court

16  is not prohibiting it, but it's up to the state court to

17  determine if the state court is allowing it?

18          THE COURT:  This court would defer to the state

19  court's judgment as it relates to the welfare of the children

20  and the parties in this matter.  That's all I'm concerned

21  about.

22          MS. CHARTIER:  If the state court did allow it, would

23  this Court -- could we add it to the order that it would not be

24  a violation of condition 7H, if the state court were to allow

25  the Attars to live at their home with their daughter?  Because

```
 1    that was the condition that the state court was really --
 2              THE COURT:  Pretrial services, who has that file?
 3              PRETRIAL SERVICES REPRESENTATIVE:  Your Honor,
 4    pretrial services would not object to it.
 5              THE COURT:  Yeah.  I think that's fine, if that's what
 6    we're talking about.
 7              MS. CHARTIER:  Thank you.
 8              THE COURT:  But the library is out.
 9              MS. CHARTIER:  Okay.  Thank you.
10              THE COURT:  So we have that issue.  And you'll present
11    an order to that?
12              MS. CHARTIER:  Yes, Your Honor.
13              THE COURT:  Okay.  Good.  The next issue we have is
14    the motion for pretrial release.
15              MS. SMITH:  May I?  Your Honor, would you prefer me to
16    stay here?
17              THE COURT:  Wherever you are happy.
18              MS. SMITH:  Okay.
19              THE COURT:  When we have defendants, they always argue
20    from the podium, but this is a motion.  Wherever makes you feel
21    good about it.
22              MS. SMITH:  Okay.  I feel good here so I'll just stay.
23    Thank you.
24              Your Honor, this issue was brought to the Court's
25    attention a couple of months ago when we filed an initial
```

1    motion to seek pretrial release.  During that motion hearing,

2    the Court indicated that it was concerned -- it had a

3    heightened concern about the risk of flight with respect to

4    Dr. Nagarwala.

5          After that hearing, we had substantial conversations

6    and did substantial amounts of work to determine how we could

7    make this Court feel comfortable that Dr. Nagarwala would not

8    be a flight risk.  And as the Court is aware, we've put

9    together a motion for pretrial release with a number of

10   suggestions in order to satisfy this court that Dr. Nagarwala

11   will not flee.

12         When the government responded to the motion, there's a

13   few things I would just like to address with the Court.  They

14   make a very big deal about the fact that my client attempted to

15   board an international flight to Kenya on Wednesday, April

16   12th, which was two days after my client was advised of the

17   investigation.

18         On that date, Dr. Nagarwala actually came to my

19   office, met with me for the first time and retained my

20   services.  If Dr. Nagarwala was planning to flee, she would not

21   have come to my office, consulted for my services, wasted the

22   time and money to do so knowing that she was not planning to

23   come back and fight these charges.  Dr. Nagarwala went to the

24   airport that afternoon and did attempt to fly to Kenya.  And it

25   was the same plane tickets she had told Homeland Security and

Protective Services about on Monday.  And when Dr. Nagarwala

told them of her of her travel plans, she was concerned because

she wanted to make sure she didn't miss any interviews.  She

actually invited them to come to her house sooner to make sure

she had an interview before she left.

Throughout all of those conversations, the government

never said to her you shouldn't take that trip or this trip is

bad timing.  Nothing along those lines.

So when my client came to my office and met with me

and retained me and said, "I'm going on this trip," one of the

pieces of advice I gave her was:  "Your cell phone is not going

to get calls if it's over in India on airplane mode.  Leave

your phone at home with your husband so that if calls come in

on this case, I can return them or he can return them and we

can make sure that that phone is not getting calls that nobody

is getting."

So when Dr. Nagarwala left my office, she did get a

new cell phone.  The new cell phone -- the plan was to go to

India -- I'm sorry, Kenya.  Get a SIM card.  Put the SIM card

in the phone and that way she would be able to use it while she

was with her daughters without incurring data roaming and other

charges.

So while the government articulates throughout its

brief that it seems like she had this plan to flee based on the

cell phone and based on the, you know, flight plans, I think

1    it's overstated and it's just not accurate.  And to be quite

2    honest, I didn't realize how fast this investigation was going

3    and I feel terrible that Dr. Nagarwala has been in jail as a

4    result of me not telling her don't go on the trip and as a

5    result of me telling her leave the phone at home.

6              In addition to that, if my client was going to do

7    anything funny with the phone, it would be in a lake today.

8              It's not --

9              When Dr. Nagarwala was arrested, Moiz, her husband,

10   immediately gave the phone to the FBI and when they called and

11   said we can't get into it because it's locked, I gave them the

12   password as soon as I could.  There was no attempt in any way

13   to try to do anything funny with the phone.

14             So what we have set up, as the Court is aware, we were

15   suggesting a third party custodian.  And if this Court is not

16   comfortable with Moiz Nagarwala, because he is a part of

17   phone calls and discussions, we would also propose that

18   Dr. Nagarwala's father, Fakhruddin Kurwadawa (ph), is also

19   available to stay in Michigan.  He has a home in Maryland, but

20   lives half in Maryland and half in Michigan.  He could stay in

21   Michigan and be that third-party custodian.  He has absolutely

22   no connection to the case and no allegations lodged against

23   him.  He has not heard any of the conversations.  Even in those

24   first days --

25             THE COURT:  Where does he live?  I forgot.  When he's

1    in Michigan.

2              MS. SMITH:  He lives in Washington D.C.

3              THE COURT:  I know that.

4              MS. SMITH:  Then -- so he's living right now in

5    Dr. Nagarwala's home.

6              THE COURT:  That's what I wanted.

7              MS. SMITH:  So he is helping Moiz take care of the

8    children.

9              THE COURT:  I got it now.

10             MS. SMITH:  Okay.  And so in addition to that, there

11   are community members who are willing to put up their houses.

12   When we were in court, the Court indicated the community

13   support is both a blessing and a curse.  It shows the community

14   is behind her, but it also shows there are people who will help

15   her flee.

16             I can tell the Court that these families would not be

17   willing to lose their homes if they didn't have the utmost

18   faith in Dr. Nagarwala.  Those properties total $4,237,000 in

19   assets that would secure a bond for my client.

20             In addition to that, noncommunity members, people who

21   are related to Dr. Nagarwala as well as cosigners who are not

22   related to Dr. Nagarwala are willing to post cash bonds.

23             And the people who are not related to Dr. Nagarwala

24   are not even a -- are not even members of the Dawoodi Bohra

25   community.  In fact, those people are all Hindu.  So we have a

1  wide variety of support showing that there's a lot of faith

2  that Dr. Nagarwala is not going to flee this country or not

3  fight these charges.

4          And I know the Court's read through the rest of my

5  suggestions.  And if the Court has specific questions, I'm

6  happy to answer those, but I won't not belabor my argument.

7          THE COURT:  You have been very specific and I

8  appreciate it and you did a very good job.  I'll tell you right

9  now.

10          MS. SMITH:  Thank you.

11          THE COURT:  I have read every word of it.  And so I

12  appreciate it.

13          MS. SMITH:  Thank you.

14          THE COURT:  And, Ms. Woodward, you also have done a

15  very good job.

16          MS. WOODWARD:  Thank you, Your Honor.

17          THE COURT:  It has kept me up many a night and I have

18  spent all weekend rereading and reading and rereading.  So I

19  know the history very well.

20          MS. SMITH:  I have one more thing and I'm so sorry.  I

21  also want to point out to the Court, Dr. Nagarwala faces the

22  exact same penalties as Dr. Attar who is out on bond.  I think

23  the Court can see over the last couple of months that Dr. Attar

24  and all of the defendants have been model defendants.  Anytime

25  there's an issue with a bond, they seek stipulations.

1    Dr. Nagarwala would do the very same thing and I just

2    want to make sure the Court understands.  The penalties are no

3    different for him, and being out on bond has not been an issue

4    today.  There have been no violations, in fact, for any of the

5    defendants.

6        THE COURT:  Counsel?

7        MS. WOODWARD:  Thank you, Your Honor.  I'll start

8    where Ms. Smith just left off.  It's true that the maximum

9    penalties that Dr. Nagarwala and Dr. Attar face are the same.

10   But I think it's clear to the Court that Dr. Nagarwala's level

11   of culpability and potential exposure at sentencing is the

12   greatest of all of the defendants.

13       The government argued at the last bond hearing and we

14   continue to argue that Dr. Nagarwala poses a danger to the

15   community as well as a flight risk.  And I'm not going to go

16   into the facts that we believe support that she's a danger

17   other than just to say that this was a 12-year conspiracy and

18   that Dr. Nagarwala is the one who directed that conspiracy, who

19   organized the appointments and she is the one who wielded the

20   tool the government asserts was used to cut the genitals in

21   countless young girls.

22       And the penalties here is something for the Court to

23   consider, of course.  It is not an overstatement to say that

24   the penalties she's facing here is a 10-year mandatory minimum

25   and up to life imprisonment.

1           Turning to her risk of flight and the evidence of

2   flight.  I appreciate the factual proffer from Ms. Smith.  Some

3   of that information is not something that I knew before today.

4   I do want to respond to that.  When the defendant went to the

5   airport without her phone, I understand it's the offer of

6   Ms. Smith that it was her suggestion to the defendant that she

7   leave her phone at home.

8           I'll also point out that the defendant wouldn't have

9   known that her phone could be subject to search when she

10  crossed international lines.  And also, it's not fair to say

11  that she didn't do anything to the phone.  The phone did

12  contain mass deletions and text messages with the co-defendants

13  that had been deleted.  And when you add those facts to the

14  other behavior, to the conversations telling the people in the

15  community to deny everything to her conversations with

16  Dr. Attar and with her husband, it's clear that this was a

17  day -- April 10th of 2017 was a day that Defendant Nagarwala

18  may have known might come some day and she may have thought

19  about in advance what she would do if anyone ever came and was

20  investigating her for female genital mutilation.

21          So when you think about that, that -- put her actions

22  in that light, that she knew this might happen, she immediately

23  spoke with her co-conspirators on the phone about what to tell

24  law enforcement, how to change her behavior, what to do, that

25  that does characterize her decision to board the flight on that

1    day.  And at the end of the day we don't know if she would have

2    come back to the United States.

3         Of course, the Court also considers the history and

4    characteristics of the defendant and here the defendant does

5    have strong ties to the community, but many of those ties have

6    been broken over the last five months due to this

7    investigation.  She has lost her job.  She has lost temporary

8    custody of her children.  She may lose her parental rights and

9    she's facing significant incarceration.  And those things go

10   against the belief that she would have a reason to stay here.

11   She would have strong motivation to flee.  She also has ties

12   overseas with two of her children in Kenya and family and

13   property that she owns in India.

14        And I don't think anyone is disputing that she has

15   significant resources.  It can be no dispute that should she

16   make it out of the country she would absolutely have the

17   resources to live abroad and potentially evade arrest.

18        Her motion sets out her assets and the assets of her

19   husband and family members.  And between the defendant and her

20   husband alone, she may have access to as much as 2.4 million

21   dollars.  Some of which is liquid and some of which is not.

22        I appreciate the hard work that must have gone into

23   the bond package proposed by Ms. Smith.  And it is not

24   insignificant what she is offering to do.  She's offering to

25   encumber Dr. Nagarwala's assets and property.  But in this

1    court, that's simply not our practice.  And we don't even have

2    a clear mechanism to encumber money, assets or property.  The

3    same thing for the assets and property that belong to her

4    friends and family members.

5            And even if there was a way to encumber her family and

6    friends' property, imposing consequences on her family after

7    she flees, I think, is not something the Court should be

8    willing to do.

9            The government continues to believe that Moiz

10   Nagarwala is not a proper third-party custodian for the reasons

11   set forth in our brief.  And, most importantly, that the

12   defendant is offering to waive her extradiction rights.  But as

13   we argued in our brief, that waiver is nonenforceable and that

14   extradition from India may be possible but it would take no

15   less than numerous years to accomplish it.  And it might not be

16   successful at all.  And at the end of the day, the defendant

17   has significant motivation to flee.  She is facing a very

18   significant sentence.  And if she flees, we would be trying

19   this case without the most culpable defendant here.  We would

20   have to go forward --

21           THE COURT:  But you would be sitting here in a vacant

22   seat.

23           MS. WOODWARD:  Correct.

24           THE COURT:  I have one question, please, Ms. Smith.

25   Is there an order in another court that she's not to be with

1  her children in a living environment?

2  　　　　MS. SMITH:  The issue of removal with respect to

3  Dr. Nagarwala is not in an order.  However, I would not be able

4  to let Dr. Nagarwala move back into the house without getting

5  clarification in the state court on that issue.  Because right

6  now her parenting time is supervised by people who watch her

7  visits with her children at the jail.  So what I would have to

8  ask the Court to do is to allow Dr. Nagarwala to move into a

9  hotel situation the same my way --

10  　　　　THE COURT:  That was my question.

11  　　　　MS. SMITH:  Right.  The same way the Attars have.

12  Because I just don't want to step on the state court's toes --

13  　　　　THE COURT:  I don't either.

14  　　　　MS. SMITH:  -- and make sure it's done right.

15  　　　　THE COURT:  In this matter, as I've indicated, I've

16  spent a lot of time reviewing this.  The defendant has offered

17  a very, very comprehensive package to ensure the presence of

18  the defendant, a very comprehensive.  And has offered many,

19  many people who the Court finds from the pleadings -- and I

20  find the pleadings are signed by a honorable member of our bar.

21  So I find that there is certainly something I should rely on.

22  And the people that have come forward to assist the defendant

23  in this particular matter are very substantial and they're

24  citizens -- or not citizens.  Their citizenship, their ties to

25  the community and they are very, very substantial.

1          And the Court believes that taking two presumptions

2     into account, number one, the presumption of innocence; and

3     number two, the presumption that there are no conditions in

4     terms of being able to come up with a solution to allow

5     pretrial release.

6          And I believe it is that second presumption has been

7     overcome.  I think that there is a reasonable and probably more

8     than reasonable offer that the defendant has made that would

9     ensure the defendant's presence when and where directed by the

10    Court and would also place a very large, large detriment on her

11    family, on her community, on her friends and her family should

12    she not appear.  And also should she not appear, then she will

13    be tried without her presence here and that, as we all know, is

14    very, very bad for any defendant and is, generally, though I've

15    never done it, from everything I have read, pretty much a

16    certainty of conviction.

17         So there are lots of things outstanding there.  And

18    I'm going to take the defendant up on their offer to some

19    extent.  I think their offer is very, very broad.

20         So number one is I will release her on the following

21    conditions.  And I came up with a figure of 4.5 when I added up

22    all the assets.  So I'm going to order that there is an

23    unsecured bond -- when I say unsecured, I meant at one secured

24    of 4.5 million dollars.  And I did the same thing counsel did.

25    Just round it off a little bit more.

1          And that the other condition in amounts of security,

2    I'm going to ask they put their home in Northville up as

3    security.  And we do have a whole procedure on that and they'll

4    work with them.

5          That's the only thing I'm doing.  So the record is

6    clear.  I'm doing that because should she flee, she's really

7    hurting her kids and her family and everything else as in

8    addition to her friends.

9          Number two:  That it will be cosigned by all of those

10   people that I referred to on page 15 and 16, there's three

11   people there and those are more relatives.  Cosigned by them.

12   And it will also be cosigned by the persons mentioned on page

13   18 through 20 and there's seven persons.  When I say "persons,"

14   they're all couples.  And I'd expect that both of those couples

15   will sign.

16         The defendant has offered that these people would put

17   up their homes and so forth.  I think that if they both sign,

18   they are jointly and severally liable with everyone else so the

19   government will have access to lots of properties by those

20   signatures.

21         The only thing that I ask is that we use regular forms

22   and that we have one other form and those people sign a

23   statement that they understand what they're doing.  That

24   they're guaranteeing this bond and they understand it's for --

25   you know, our forms are not quite in the language for the

1    average person.  They understand that should she not appear

2    that they will be responsible for the 4.5 million either

3    individually or jointly and severally just so that everybody

4    can sign something.  Because many of them are out of state so I

5    can't talk to them.  You know, I think it should -- and that

6    they understand it.

7            So all of those will sign a guarantee.  I will enter

8    an order freezing her retirement accounts and her husband's

9    retirement accounts that was offered.  And I assume her husband

10   has no objection to that, since it was offered.

11           Also, the safety deposit boxes which I will enter an

12   order of freezing.  I will require her to return -- she's

13   already done her passport -- her husband and her two children

14   that are now in the United States.

15           I will accept a waiver of extradition.  I agree with

16   the government.  I'm not so sure that the waiver of extradition

17   really has a whole lot of meaning to it, but since it's been

18   offered, I will accept it and have no reason to believe that

19   should she abscond she'll go to India.  But since it's been

20   offered, I think we should do that also.

21           Also, I'm going to order that she have a tether with

22   her at this time.  And then we can take a look at that later.

23   But I'm going to order her a tether and that also that she --

24   when she abides by all of these conditions, that she reside in

25   a place other than in her home.  At one of these residences,

1   that would be fine.  But not at the same one.

2              MS. SMITH:  If the state court will allow

3   Dr. Nagarwala back in her home, would the Court --

4              THE COURT:  Yes.

5              MS. SMITH:  Okay.  Thank you.

6              THE COURT:  Okay.  I'm going to order her under the

7   same terms and conditions as the Attars.

8              MS. SMITH:  Thank you.

9              THE COURT:  Not the same condition, but the same

10  option should the state court, you know, allow her into the

11  home, yes, she may go back.  But all the other conditions about

12  contact and all those other conditions that I put on the Attars

13  would also apply to her.

14              Okay.  Pretrial services, is there that anything I've

15  forgotten?

16              THE COURT:  Just so everybody knows, we have a

17  procedure we talked about, you know, proposing a secured

18  bond -- I've been reading it all weekend -- on property and it

19  is fairly extensive.

20              Also, again for the record, we have a form that the

21  assureties have to fill out, too, and sign and so forth that

22  gives us information concerning all of their assets and so

23  forth.  And I don't know if any of you have seen that form.

24  It's called Assurety Information Sheet.  So all of those people

25  that will be signing will have to fill out this sheet and also

1    have to have it witnessed and so forth.  But it's a form.

2          And I didn't get -- your name one more time, sir.

3          PRETRIAL SERVICES REPRESENTATIVE:  Your Honor, Michael

4    Mitchell, for the record, for pretrial services.  The pretrial

5    services would recommend additional conditions that the

6    defendant not possess a firearm or destructive device or other

7    dangerous weapon.  That her traveling be restricted to the

8    Eastern District of Michigan.  That she not use or unlawfully

9    possess a narcotic drug or other controlled substance.  That

10   she submit to location monitoring, Global Positioning Satellite

11   system, and that she pay all the program costs of the program

12   based on her ability to pay for location monitoring.

13         THE COURT:  So you're recommending GPS?

14         PRETRIAL SERVICES REPRESENTATIVE:  Yes, Your Honor.

15         THE COURT:  I'll order GPS.  And the other conditions

16   are standard conditions.  So I don't see any problems with

17   those, but I will accept that recommendation.

18         PRETRIAL SERVICES REPRESENTATIVE:  Your Honor, also

19   that the defendant be submitted to home incarceration and she

20   be restricted 24 hours a day to her place of residence and not

21   be able to leave except for, uh ...

22         THE COURT:  I think we have it already.  Because

23   that's part of the first order.

24         PRETRIAL SERVICES REPRESENTATIVE:  Okay.

25         THE COURT:  Anything else?

1          PRETRIAL REPRESENTATIVE:  That's it, Your Honor.

2          MS. WOODWARD:  That's another thing I was going to

3    clarify.  It would be our request that she be on home

4    incarceration.

5          Some of the other conditions that were towards

6    the Attars that I think are important to articulate for

7    Dr. Nagarwala today, it would be our request that she not have

8    contact with anyone other than family members.  That she not

9    have any international --

10         THE COURT:  Any objection to that?

11         MS. SMITH:  No objection.

12         THE COURT:  That's fine.

13         MS. WOODWARD:  That she not have access to any

14   internet capable devices.

15         THE COURT:  That's fine.  But I think with the same

16   restriction as the Attars have in terms of with their

17   attorneys.

18         MS. WOODWARD:  Correct.

19         THE COURT:  Yes.

20         MS. WOODWARD:  That she specifically not attend the

21   Anjuman-e-Najmi mosque in this case, which is a condition that

22   the Attars have as well.

23         THE COURT:  I understand.  That's already a condition.

24         MS. WOODWARD:  Okay.  And then it wasn't clear to me,

25   but perhaps Your Honor said it, who Dr. Nagarwala would be

1    residing with or if there would be a third-party custodian.

2             THE COURT:  Right now she would be residing in a

3    hotel.  We need a third party custodian.  We'll make it her

4    father right now.  Because he's living at home, too.  And then

5    we wouldn't have to get into a problem.  But we need a

6    third-party to assign.

7             MS. WOODWARD:  If I can just have a moment, please?

8             THE COURT:  Yes, please.  Get it all out.  It's not

9    going an easy paperwork, but some of them are forms.

10            MS. WOODWARD:  So the bond condition to be an

11   unsecured bond of 4.5 million.  The secured bond of the house

12   in Northville and then this whole thing would be co-signed by

13   all the people you identified.

14            THE COURT:  Correct.  All the people that were

15   identified in the -- in her -- in Ms. Smith's thing, they are

16   contained on page 15 and 16.  And when I say, "three people,"

17   they're husbands and wife mostly.  And I believe on page 18

18   through 20, there's seven people.  And I would read the names

19   into the record, but as you know, I can't pronounce them.  So

20   there's no use reading them.  And if you look at those pages,

21   they're very well said.

22            MS. WOODWARD:  Okay.  Thank you.

23            THE COURT:  Anything else?

24            Ms. Smith, something else?

25            MS. SMITH:  No, Your Honor.  Thank you.

1           THE COURT:  As I know that -- I've been in contact

2    with pretrial trying to get all these forms.  So I think you

3    can work with them, but we do have a package and when you send

4    them out of the state, just make sure that you put this little

5    statement on it.  Because there is a form that they're going to

6    want them to fill out, the Assurety Information Sheet.   And I

7    see here from that sheet they signed it and there must be

8    somebody to guarantee their signature.  If they do it in court,

9    then it's like a notary.  You know.

10          MS. SMITH:  That's fine.

11          THE COURT:  I'm just saying.  I'm looking at the form.

12   Just so you have know.

13          MS. SMITH:  I appreciate it.  I'll talk to

14   Mr. Mitchell and get the forms and go from there.

15          THE COURT:  Yeah.  And then the same thing with, with

16   the house.  For all of those in the law, I appreciate that.

17   Your house or any home to assign, it's just too complicated,

18   but they do have a form that's fairly easy for the house.

19          MS. SMITH:  Great.  Thank you.

20          THE COURT:  Anything else we should to be talking

21   about.  I know we have some date coming up soon for a pretrial

22   kind of thing.  Anything else we should be talking about while

23   we have everyone here?

24          MS. WOODWARD:  You have something on bond.

25          PRETRIAL REPRESENTATIVE:  Where should we have the

1   defendant sign the bond paperwork?

2         THE COURT:  It's going to take more than one day.

3         PRETRIAL SERVICES REPRESENTATIVE:  Okay.

4         THE COURT:  I think you guys are going to have to meet

5   because you're going to have to provide them with that form,

6   the Assurety form, that the assureties have to sign.  So we

7   have 10 assureties that have to sign first.  And if you want to

8   do the paperwork here, too, as to this defendant since she is

9   here so that when all the paperwork is done she can get

10  released, that's fine, too.

11        PRETRIAL SERVICES REPRESENTATIVE:  Would the cosigners

12  need to appear in court?

13        THE COURT:  The cosigners would have to sign

14  documents.  They wouldn't have to appear in court because most

15  of them are out-of-state, but they would have to fill out this

16  form, the Assurety Information sheet and that would be --

17        I'm just reading it.

18        They have to fill that out and they'd have to fill out

19  the normal assurety form.  And in the condition I put on this

20  just that they understand.

21        PRETRIAL SERVICES REPRESENTATIVE:  Thank you, Your

22  Honor.

23        THE COURT:  We'll use many of the standard forms that

24  we have.  When you do a big real estate or something people are

25  all over the country so they sign different documents at

1     different times.  So then all you have to do is to make sure

2     you have all the signatures together for all those 10 people

3     and the defendant.  And in this procedure, I think it would not

4     be so difficult for the home to have all the closing papers on

5     the house and have all that information.  Again, the attorney

6     will draft all that.

7                    PRETRIAL SERVICES REPRESENTATIVE:  Yes, Your Honor.

8                    MS. WOODWARD:  All right.

9                    THE COURT:  Okay.  Go ahead.

10                    MS. WOODWARD:  I was going to move to discovery and

11     trial date.  I would like the Court to know we were set for a

12     pretrial conference today.  We met, all of us, the lawyers on

13     the case for both sides this morning to discuss discovery

14     issues, to talk about realistic motion to cutoff and trial

15     date.

16                    THE COURT:  Yes.

17                    MS. WOODWARD:  So what we will be doing is submitting

18     a stipulation and order to the Court to adjourn the trial date.

19     If possible, we would like to have a status conference set for

20     the beginning of November so that we can see where we are for

21     discovery.  The government would like a motion cutoff date.  I

22     think there has been references to large constitutional

23     motions.  So we would like a cutoff for when those motions

24     would be filed.  The defense wants to make sure they have all

25     discovery needed to file their motion.  We don't have a firm

1    agreement yet on the motion cutoff date, but we're talking

2    about February or March of this year.  But we can, perhaps, set

3    the motion cutoff date.

4           THE COURT:  Let's set pretrial for November.

5           MS. WOODWARD:  Okay.

6           THE COURT:  Between now and November, if something

7    comes up that you need my direction on, let me know.  But I

8    think we have all the protective orders, everything in place

9    for good discovery.

10           MS. WOODWARD:  We do.

11           THE COURT:  And then we will have a -- I'll give you a

12   date right now in November.  We will have a pretrial.  And

13   we'll talk about it.  February is fine.  You know, you guys

14   talk about it.  I have no idea.  I know it's going to be long.

15   So whatever you guys come up with.

16           Also, counsel, your client's waiving a right to speedy

17   trial?

18           MR. SABBOTA:  Yes, Your Honor.

19           MS. CHARTIER:  Yes.

20           MS. PRASAD:  Yes.

21           THE COURT:  Prepare me an order and I'll sign it, a

22   stipulated order, waiving the speedy trial.  As I said, this

23   case will move as quickly as the parties can move it.

24           MS. WOODWARD:  So I suppose our stipulation would then

25   exclude the time from now and get a pretrial conference date in

1    November and just a control date for the trial.  But I want to

2    be up front with the Court that I think everyone here is

3    expecting that that trial will be significantly into next

4    year.

5              THE COURT:  So why don't we pick a date in next year

6    to have your waiver so come November you don't have to do

7    another one to do it.

8              So pick a date, you know, someplace that you both

9    agree to rather than doing another one.

10             MS. WOODWARD:  Okay.  That's all.

11             THE COURT:  Okay.  You guys do the draft.

12             PRETRIAL SERVICES REPRESENTATIVE:  Excuse me, Your

13   Honor.

14             THE COURT:  Please, as many as you have.

15             PRETRIAL SERVICES REPRESENTATIVE:  One more thing.  So

16   our bond manual indicates that the cosigners must sign

17   information sheet in the presence of a court employee.  Is Your

18   Honor waiving that right?

19             THE COURT:  I'm waiving it.  They may sign it in the

20   presence of a notary public or another court.  If they happen

21   to be in another state, they can go to another court or the

22   clerk's office.  But somebody authorized to guarantee the

23   assurety's signature.  That's all.  A notary public of wherever

24   the state they're in.  And it does have to have a seal on it

25   because it goes across state lines.

```
 1              MS. SMITH:  Perfect.

 2              THE COURT:  And if they don't have it, they can go to

 3    the district court.

 4              Counsel?

 5              MR. NEWBURG:  Your Honor, Matthew Newburg on behalf of

 6    Farida Attar.  Just aware, the Court signed an order allowing

 7    the Attars to have a computer to do discovery.  It was a

 8    stipulation order that was filed, I think, last week.  I have

 9    the computer here.  There's a condition that pretrial services

10    at anytime can inspect the computer to make sure it meets the

11    requirements of this Court's order.  I can provide it to

12    pretrial services if the Court would desire before I provide it

13    to my client.  And then I've got another question to raise.

14              PRETRIAL SERVICES REPRESENTATIVE:  Pretrial services

15    can inspect the computer --

16              THE COURT:  Your name.

17              MS. CHAPMAN:  Oh, I'm sorry.  Maureen Chapman.  We can

18    inspect the computer, but it is out of our realm of expertise

19    to determine if it has internet connection or not or will in

20    the future.  So we want to make Your Honor aware of that and I

21    don't know if it's something that you would like to remove from

22    the stip and order and just allow a computer in the home.

23              THE COURT:  You're allowed to do it if you want.

24              MS. CHAPMAN:  Thank you, Your Honor.

25              THE COURT:  I'll take your word and you're an officer
```

1    of the Court and I have no reason to believe it's any

2    different.

3              However, anytime that pretrial services feels that

4    there's such a need, then the Court will ask a person that

5    knows about this third-party and we'll get some expert to check

6    it out.

7              MS. CHAPMAN:  Thank you.

8              MR. NEWBURG:  One more request, Your Honor.

9              THE COURT:  Sure.

10             MR. NEWBURG:  We spoke about it this morning.  There

11   is a religious holiday that's coming up.  I believe it begins

12   the 22nd for my clients.  They would like to view the sermons

13   online.  And I know that there's a condition that they not have

14   any access to the internet.  I'm asking the Court, if the Court

15   would allow them to have access to the internet on a different

16   device for the period of time for the sermons and provide that

17   to pretrial services.

18             THE COURT:  Absolutely.  Have somebody -- you know, I

19   don't know how long the service is.  But, you know, have a

20   paralegal or somebody just set it up for them and be there and

21   let them watch their service and do their thing.

22             MR. NEWBURG:  I think it's over the course of a few

23   days.

24             MS. CHARTIER:  I believe it's 10 day.

25             THE COURT:  I don't know how to do that.

1           MS. CHARTIER:  I believe the Court signed an order for

2   one of the codefendants allowing her to have internet access to

3   see the sermon.

4           THE COURT:  The same thing, then.  I want them to keep

5   the faith.

6           Also.  I don't know how we're going to do that.

7           MS. WOODWARD:  I was just going to clarify, Your

8   Honor.  For Ms. Shafiq, we did enter into a stipulation that

9   the Court signed.  Ms. Shafiq was already permitted to have

10  internet access to look for employment and related to her

11  employment.  That's different than the Attars.  So I agree that

12  this will be -- it's somewhat hard logistically to figure out

13  and to enforce.  They don't have any internet access capable

14  devices at this time.

15          THE COURT:  Yes.  I allow them to do it.  However, you

16  know, I know that law enforcement can check every site that

17  they've been to and everything else.

18          No.?

19          MS. WOODWARD:  Not without a search warrant, Your

20  Honor.

21          THE COURT:  All right.  You know what, I'm going to

22  allow them to participate in their religious services.

23          MS. CHARTIER:  Thanks.

24          MS. SMITH:  Your Honor that would be a request I would

25  ask for.

1            THE COURT:  For everybody.

2            MS. SMITH:  Thank you.

3            MS. CHARTIER:  The only other matter I had was I

4    believe we had a motion up today with competing protective

5    orders.

6            THE COURT:  I think you resolved that?

7            MS. CHARTIER:  I was going to let the Court know, that

8    has been resolved.  I think we've agreed to the order and it's

9    going to be entered.

10           THE COURT:  Okay.  My clerk told me that it has been

11   resolved?

12           MS. CHARTIER:  Thank you.

13           THE COURT:  Okay.  Anything else?

14           MR. SABBOTA:  Yes.  Jerome Sabbota, Your Honor.  Are

15   you going to set a date for the second week in November?

16           THE COURT:  Right now.  Carol will not let me leave.

17           CASE MANAGER COLLINS:  How about Tuesday, November

18   14th at 11:00 in the morning.

19           MS. SMITH:  In the morning, at nine o'clock, we have a

20   pretrial for the Child Protective Services.

21           THE COURT:  Let's do Wednesday.

22           MS. SMITH:  Wednesday is perfect.

23           CASE MANAGER COLLINS:   Okay.  Wednesday the 15th.

24           THE COURT:  Am I here?

25           CASE MANAGER COLLINS:  You will be now.

```
 1              MS. SMITH:  The 15th at what time.

 2              THE COURT:  11:00.  Is that good for everyone.

 3              MS. SMITH:  Thank you?

 4              MR. Sabbota:  Thank you.

 5              CASE MANAGER COLLINS:  Judge will you need the clients

 6    at that time.

 7              THE COURT:  If the clients are there, that's fine.

 8    But if we're not going to do anything substantively, there's no

 9    reason to bring them.

10              MS. SMITH:  Okay.  Great.

11              THE COURT:  I mean, I always like clients to be there,

12    if you want them, then they know what he is going on.  So

13    they're always welcome and I always encourage them to be there,

14    but I know it's a lot people.  So it's a lot of people.  So

15    those who want to, fine.

16              MS. CHARTIER:  Thank you, Your Honor.

17              THE COURT:  Okay.  Thank you.

18         (At 11:58 p.m., matter concluded.)

19                              -   -   -

20

21

22

23

24

25
```

1                  C  E  R  T  I  F  I  C  A  T  E

2

3        I, Darlene K. May, certify that the foregoing is a

4 correct transcript from the record of proceedings in the

5 above-entitled matter.  I further certify that the transcript

6 fees and format comply with those prescribed by the Court and

7 the Judicial Conference of the United States.

8

9 /s/ Darlene K. May                      September 20, 2017
       Darlene K. May, RMR, CRR, CSR              Date
10 Federal Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25